UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH SCOTT,

      Plaintiff,

v.

CITY OF PORT HURON, and
GERARD PECZENIUK,

      Defendants;

and

JOSEPH SCOTT,

      Plaintiff,

v.

JEANETTE THOMPSON,
SCOTT TALMADGE,
TIM CONGER, and
COUNTY OF ST. CLAIR,

      Defendants.

Case Nos.  15-11773,  16-11874
Honorable Laurie J. Michelson
Magistrate Judge Anthony P. Patti

---

**OPINION AND ORDER
GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

---

A data-entry error in the expiration date of a personal protection order (PPO) led to Joseph Scott's wrongful arrest and imprisonment. When the two divorced, Coralee Scott obtained the PPO against Scott. In the County of St. Clair, these orders are entered into a law-enforcement database. Jeanette Thompson was tasked with entering Coralee's. The order was to expire in six months, but Thompson mistakenly entered a one-year expiration date. Eleven months later, Gerard Peczeniuk, a police officer for the City of Port Huron, pulled Scott over for

not wearing his seatbelt. With Scott was Coralee. Peczeniuk ran a license check in the database, and it showed a valid order protecting Coralee from Scott. When Peczeniuk inquired into the PPO, Scott and Coralee both stressed that the order had expired. So Peczeniuk called dispatch. At dispatch, Scott Talmadge examined a copy of the order and verified it. But Talmadge did not look at the expiration date. Based on the database and the validation from dispatch, Peczeniuk arrested Scott. Scott ended up spending three days in jail before the whole issue was sorted out.

Scott then filed this suit (actually two suits) against Thompson, Peczeniuk, Talmadge and others asserting, primarily, that he was unreasonably seized in violation of the Fourth Amendment of the Constitution. Defendants primarily argue that they cannot be held liable because they carried out their official duties in a reasonable manner. Defendants thus assert that they are entitled to summary judgment. (*See* Case No. 15-11773, R. 16; Case No. 16-11874, R. 17.)

The Court has carefully reviewed the summary-judgment record and finds that oral argument will not aid in resolving the parties' dispute. *See* E.D. Mich. LR 7.1(f). Scott's arrest was unfortunate. But the Court believes that Defendants acted reasonably in carrying out their official duties. Mostly for that reason, Defendants are not liable to Scott.

**I.**

Because Defendants say that no reasonable jury could find for Scott, the Court views the evidence in the light most favorable to Scott. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A.

On the morning of May 30, 2013, Scott and his ex-wife, Coralee Scott, were on their way to pay Scott's water bill and then to get breakfast or lunch. (R. 17, PID 126, 144.)[1] Gerard Peczeniuk, a City of Port Huron police officer, noticed that Scott was driving without his seatbelt, so he pulled Scott over. (*See* R. 17, PID 128, 145; Case No. 15-11773, Peczeniuk Video at 10:11.) Peczeniuk obtained Scott's license and insurance information and returned to his police cruiser to run a check on the Law Enforcement Information Network (LEIN). (R. 17, PID 128, 314; Peczeniuk Video at 10:12.) The LEIN check showed a "personal protection order on file." (R. 17, PID 314.)

Coralee had sought the PPO on the day of her divorce from Scott, June 15, 2012. (R. 17, PID 124, 142, 150–51.) In her PPO request, Coralee asserted that Scott had "threatened [her] life" and was "verbally abusive." (R. 17, PID 151.) (At her deposition, Coralee said that several statements in her PPO request were false or misworded. (R. 17, PID 142–43.)) Despite the PPO, Coralee testified that the two remained "friends" after their divorce (R. 17, PID 144) and Scott testified that the two remained romantically involved (R. 17, PID 127). According to Scott, at the time of his encounter with Peczeniuk, the two were seeing each other "every day." (R. 17, PID 127.)

After completing the LEIN check on his computer, Peczeniuk returned to the Scotts' car. This conversation ensued:

| | |
|---|---|
| PECZENIUK: | What is your name ma'am? |
| CORALEE: | Coralee Scott |
| PECZENIUK: | Okay. Uh, do you have a personal protection order against— |
| CORALEE: | —Nope. No, that expired a long, long time. |

---

[1] Unless otherwise indicated, all record citations are to filings in Case No. 16-11874.

```
SCOTT:          No, that's a long time ago.[2]
PECZENIUK:      Really?
SCOTT:          Oh yeah—
PECZENIUK:      —okay.
SCOTT:          I know it's expired.
PECZENIUK:      Okay, I will be back with you.
```

(Peczeniuk Video at 10:14.)

Peczeniuk then returned to his cruiser and radioed dispatch for the County of St. Clair. He provided Scott's information (full name, sex, race, and date of birth). (Peczeniuk Video at 10:15.) Scott Talmadge, a dispatcher with the County, radioed back. Due to unknown issues with the videos, only part of Peczeniuk and Talmadge's conversation was recorded. Based on what is available, Talmadge told Peczeniuk, "I have the order in hand, it has been served. It does show he is not supposed to have contact with her." (Case No. 15-11773, Coleman Video at 10:21.)[3]

Peczeniuk then returned to the Scotts' car and proceeded to arrest Scott. (Peczeniuk Video at 10:22.) During the arrest, Peczeniuk and Coralee had a conversation that was in part recorded; Peczeniuk is heard saying, "You gotta go get the PPO removed ma'am. [Inaudible response from Coralee.] At the courthouse right there, yeah." (Coleman Video at 10:23.)

After securing Scott in his cruiser, Peczeniuk returned to the Scotts' vehicle to talk with Coralee. The police video reflects the following:

```
PECZENIUK:      You're the owner of the car, right?
CORALEE:        Yes.
PECZENIUK:      Yep. Okay.
CORALEE:        So I just go here to the courthouse—
PECZENIUK:      —yep, you go down to the courthouse but as of right now
                [inaudible] June 18.
```

---

[2] Scott and Coralee are talking over each other at this point.

[3] Both Peczeniuk's and Coleman's videos have time stamps, but it appears that Coleman's is about 17 seconds ahead of Peczeniuk's. The Court also notes that some of what Talmadge is heard saying on the recordings was not intended for Peczeniuk but, apparently, in response to another call involving a "Joseph L." (*See* R. 17, PID 354.)

| | |
|---|---|
| CORALEE: | —really? My lawyer told us January. My lawyer is right here— |
| PECZENIUK: | —right [inaudible, apparently references his "computer"] . . . we have a hardcopy at our dispatch center. |

(Coleman Video at 10:24.)

At their depositions, although both indicated that the conversation occurred before Scott's arrest, Scott and Coralee testified that they told Peczeniuk that Coralee's lawyer was across the street and had a copy of the PPO. In particular, Coralee recalled, "I said, excuse me, officer, if you'll just give me a couple minutes, my lawyer's just right here and I will go and get a copy of it and show you that it's no longer [valid]. . . . I said, if you'll just give me a minute, my lawyer, Mike Bushar (phonetic), is just right here across the way, and I will go get a copy of the PPO." (R. 17, PID 145.) Scott similarly recalled, "I says, no, I don't have [a PPO] against me. [The officer says,] Yes, you do, you're under arrest. And [Coralee] had said to him, no, he doesn't have one. It's been expired. She said, my attorney is across the street. I can get the papers and show it to you. He said, No, just sit in the car. He's going to jail. And he handcuffed me and took me in the cop car." (R. 17, PID 128.)

During the drive to the jail, Scott experienced a panic attack, so Peczeniuk took him to the hospital. (R. 17, PID 128, 130.) After Scott was medically cleared, Peczeniuk proceeded to the jail. (R. 17, PID 130.) Scott ended up staying in jail for three days. (*See* R. 17, PID 131, 350.)

**B.**

It turned out that Scott and Coralee were right: the PPO had expired.

The reason the LEIN informed Peczeniuk that the PPO was not expired was because of a data-entry error. In the County of St. Clair, after a judge enters a PPO, a copy of the order is brought (or faxed) to the County of St. Clair Central Dispatch Authority. (R. 17, PID 169–70.) One of the dispatchers, who is also responsible for answering calls, then manually enters the

PPO into the LEIN. (R. 17, PID 174, 217, 221, 257.) The expiration date is typed in only once. (R. 17, PID 181, 199.) After that process is complete, the hardcopy is then handed over to another dispatcher (the parties refer to this person as the "second-party checker"), who calls up the entry in the LEIN and checks the entered data against the hardcopy. (*See* R. 17, PID 185, 219, 221–23, 261.) The hardcopy is then kept in a physical file at dispatch until the system informs the dispatchers that the PPO is expired. (R. 17, PID 192, 223–24, 263.) At that point, a dispatcher pulls the PPO and sends it back to the court. (R. 17, PID 223–24.)

On the day that Coralee's PPO was brought over to dispatch, Jeanette Thompson was the dispatcher tasked with entering PPOs. (*See* R. 17, PID 180.) She mistakenly entered Coralee's PPO as expiring in one year, June 18, 2013. (R. 17, PID 237.) In fact, the PPO had an expiration date of six months, December 18, 2012. (R. 17, PID 155.) When later asked how the date got entered incorrectly, Thompson testified, "Probably because I was busy and I entered it in incorrectly." (R. 17, PID 180.) Notably, only four dispatchers were working at the time, and, on average, dispatch received 700 to 800 calls in a 24-hour period. (R. 17, PID 174, 216.) Also, although she did not attribute her error to it, Thompson had entered an expiration date of June 18, 2013 in the LEIN for the PPO she processed about 40 minutes before processing Coralee's. (*See* R. 17, PID 240.)

Thompson's error was not caught by the second-party checker.

Nor was the error caught during a monthly validation. Each month, dispatch received a packet of warrants and PPOs from the State of Michigan to check against the data in the LEIN. (R. 17, PID 271, 361.) Although Talmadge could not say for certain that Coralee's PPO was part of a monthly validation, he testified that he would have "expect[ed]" it to have been part of one. (*See* R. 17, PID 285.)

6

Nor was the error caught by Talmadge when he was radioed by Peczeniuk. At his deposition, Talmadge hinted that there were several reasons for this. First, he testified that the hardcopy of the PPO at dispatch was pulled during the call "[t]o confirm it had been served and to confirm the names of the people on the order." (R. 17, PID 270.) When asked if he would normally look at the expiration date on the PPO, Talmadge responded, "Not normally. It's at the bottom of the order and my primary concern is that the names match up and the separate paperwork that would be attached with the proof of service on it." (R. 17, PID 280.) Second, while handling Peczeniuk's call, Talmadge had to handle a call about an officer being assaulted, including sending that officer immediate backup. (R. 17, PID 274.) Third, according to Talmadge, Peczeniuk never told him that Scott had claimed the PPO was expired. (R. 17, PID 278.)

### C.

Scott sued. Initially naming only Peczeniuk and the City of Port Huron, Scott claimed, among other things, that Peczeniuk arrested him in violation of the Fourth Amendment's prohibition on unreasonable seizures and that the City of Port Huron was liable for failing to adequately train its officers. (Case No. 15-11773, R. 1.) Scott later filed a second action, which is also before this Court, asserting, among other things, that Thompson's data-entry error and Talmadge's failure to notice the error caused him to be unreasonably seized in violation of the Fourth Amendment. (Case No. 16-11874, R. 1.) Scott also named Thompson and Talmadge's supervisor, Timothy Conger, and those three defendants' employer, the County of St. Clair. (*See id.*)

All six defendants seek summary judgment on all claims. (Case No. 15-11773, R. 16; Case No. 16-11874, R. 17.)

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

### A.

The Court begins with what appears to be Scott's primary claim in this case, that Defendants violated his Fourth Amendment right to be free from "unreasonable . . . seizures" when they arrested him or caused his arrest. Beginning with Thompson, the Court examines Scott's claim again each of the six Defendants separately.

### 1.

Scott claims that Thompson, by entering the wrong expiration date for the PPO into the LEIN, caused him to be unreasonably seized in violation of the Fourth Amendment. (R. 1, PID ¶¶ 29, 32; R. 20, PID 428.) Scott seeks to vindicate this right via 42 U.S.C. § 1983.

Thompson's initial counter is that "it is well settled that mere negligence or mistake, without proof of the culpable mental state applicable to the underlying constitutional right alleged, cannot sustain a cause of action under § 1983." (R. 17, PID 97.) But § 1983, at least as it applies to individuals, "contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right." *Daniels v. Williams*, 474 U.S. 327, 329–30 (1986).

And even if Thompson did not mean to suggest that a claim under § 1983 requires more than negligence, her argument is incomplete: she never says what mental state is applicable to the underlying constitutional right alleged. And none of the cases she cites are helpful: they all

8

involve the culpability standards under the Eighth and Fourteenth Amendments. (*See* R. 17, PID 98 (citing *Daniels v. Williams*, 474 U.S. 327 (1986); *Floyd v. Cty. of Kent*, 454 F. App'x 493 (6th Cir. 2012); *Aaron v. Finkbinder*, 793 F. Supp. 734 (E.D. Mich. 1992)).)

The Court believes that *Heien v. North Carolina*, — U.S. —, 135 S. Ct. 530 (2014), supplies the standard. There, the Supreme Court reiterated that the touchstone of the Fourth Amendment is "reasonableness," *id.* at 534—it prohibits only "unreasonable searches and seizures," U.S. Const. amend IV. And "[t]o be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." *Id.* at 536 (internal quotation marks omitted). "The limit is that the mistakes must be those of reasonable men." *Id.* (internal quotation marks omitted).

A review of the summary-judgment record reveals that Thompson made a reasonable mistake. On a typical shift, a St. Clair County dispatcher handles dozens of calls. (*See* R. 17, PID 174, 216). So Thompson was almost assuredly interrupted by incoming calls when she was trying to enter the day's PPOs. (*See* R. 17, PID 257.) Indeed, Thompson testified that being "busy" probably contributed to the error (R. 17, PID 180) and Talmadge testified that, as a general matter, dispatch was understaffed, making the probability of an error higher (R. 17, PID 257–58). Moreover, aside from the expiration date, there were a number of critical pieces of information Thompson had to—and apparently did—enter correctly: whom the order protects, whom the order restrains, and the terms of the order. That Thompson entered most of the critical information correctly cuts against a finding that her mistake was unreasonable. Finally, the process of entering PPOs into the LEIN was not even designed for Thompson to be perfect: a second-party checker was supposed to catch any errors. Given that Thompson was at best busy

9

and at worst distracted, that she apparently entered other critical information correctly, and that she was entering the data with the knowledge that it would be reviewed, the Court cannot say that her mistake of entering the wrong expiration date was unreasonable.

In his brief, Scott argues that Thompson's mistake was not reasonable—her conduct was reckless. (*Id.*) Scott points out that the "expiration date on the PPO was clear and unmistakable." (R. 20, PID 429.) But the Court is not convinced that the expiration date is quite as conspicuous on the PPO as Scott suggests. (*See* R. 17, PID 155.) Even it is, this would only show that a reasonable dispatcher would have seen the date—not that a reasonable dispatcher would always enter it correctly.

Scott also argues that Thompson was reckless because, at the time of Coralee's PPO, PPOs were normally for six months. Scott thus concludes that "when the date was put in for 1 year, that should have caused Defendant Thompson to pause and take a second look[.]" (R. 20, PID 429.) As an initial matter, the testimony on this point was far from one-sided. True, Conger testified that, at the time, PPOs were "normally six months." (R. 17, PID 221.) But Thompson testified that over the course of her career, PPOs were "[u]sually six months or a year." (R. 17, PID 179.) And Talmadge said, "Normal PPOs that we see are either six or 12 months." (R. 17, PID 256.) But even taking the evidence in the light most favorable to Scott, the fact that PPOs were "normally" for six months does not mean that a year-long PPO was uncommon. Indeed, the PPO that Thompson entered right before Coralee's was for a year. The prevalence of six-month PPOs does not mean the transcription error was objectively unreasonable conduct.

In sum, the Court finds that in entering the wrong expiration date of the PPO into the LEIN, Thompson made an objectively reasonable mistake. As such, she did not violate Scott's

Fourth Amendment right to be free from an "unreasonable" seizure. *See Heien*, 135 S. Ct. at 536.[4]

**2.**

Scott claims that Talmadge, by failing to verify the expiration date or relay the date to Peczeniuk, caused him to be unreasonably seized in violation of the Fourth Amendment. (*See* R. 1, ¶¶ 29, 32; R. 20, PID 428.)

Talmadge's response is the same as Thompson's. (*See* R. 17, PID 97–101.) And, as with Thompson, the Court believes that Talmadge's conduct was objectively reasonable. *See Heien*, 135 S. Ct. at 536.

As an initial matter, the summary-judgment record does not permit a reasonable inference that Peczeniuk had indicated to Talmadge that there was a specific issue with the expiration date. To be sure, the police video plainly shows that Peczeniuk decided to call dispatch because Scott and Coralee had claimed that the PPO had expired. (Peczeniuk Video at 10:14.) And so a reasonable inference based on the video alone is that Peczeniuk relayed Scott and Coralee's claim. But the video is not the whole of the summary-judgment record. In particular, Talmadge testified as follows:

> Q. Did Officer [Peczeniuk] ever indicate to you hey, this guy claims this PPO is expired?

---

[4] The Court acknowledges that Scott has sued Thompson and the other individual defendants in both their personal and official capacities and that qualified immunity is not a shield against an official-capacity claim. But, "as long as the government entity receives notice and an opportunity to respond," a suit against an individual in his official capacity "is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). As Scott has sued the entities that the individual defendants work for, i.e., the County of St. Clair and the City of Port Huron, the Court does not address his official-capacity claims against Peczeniuk, Thompson, Talmadge and Conger. *See id.* at 166 n.14 ("There is no longer a need to bring official-capacity actions against local government officials, for under [*Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978)], local government units can be sued directly for damages and injunctive or declaratory relief.").

> [TALMADGE:] He did not. . . . If he had questioned the expiration date, I could have looked at the bottom of the paperwork where the expiration date is and compared it to what the LEIN entry was. . . .
>
> Q. Is it your testimony that Officer [Peczeniuk] never mentioned anything remotely about any question about the expiration of that PPO?
>
> A. Correct.

(R. 17, PID 278–79.) And, although the video does not include much of Peczeniuk and Talmadge's conversation, what it does include is not contrary to this testimony. As for Peczeniuk, he apparently does not recall the conversation with Talmadge. Peczeniuk testified that his sole recollection of the events was from reviewing his police report. (R. 17, PID 311.) Accordingly, taking the record as whole, the Court does not believe it would be reasonable to infer that Peczeniuk indicated to Talmadge that the PPO may have expired. Instead, Peczeniuk must have asked Talmadge to more generally validate the PPO.

And working from that premise, Talmadge's failure to verify or relay the expiration date was an objectively reasonable mistake. True, the fact that Talmadge did "[n]ot normally" check the expiration date troubles the Court:

> Q. Now, why would [the PPO] be pulled [from file cabinet at dispatch]?
>
> [TALMADGE:] To confirm it had been served and to confirm the names of the people on the order.
>
> Q. Would you have looked at the expiration on that too?
>
> A. Not normally. It's at the bottom of the order and my primary concern is that the names match up and the separate paperwork that would be attached with the proof of service on it.

(R. 17, PID 280.) But this must be assessed against what Talmadge knew or likely knew about the PPO's expiration date. For one, Talmadge had already verified the PPO in the LEIN. (R. 17, PID 275, 287.) And the LEIN included this entry: "INJUNCTIVE ORDER EXP — 06/18/2013." (Case No. 15-117733, R. 16, PID 206; *see also* R. 17, PID 287.) For another, when PPOs expire, the system at dispatch (presumably the LEIN or CAD) automatically provides dispatchers with a notice to that effect and, per protocol, the dispatchers remove the hardcopy of the PPO from the

12

file. So the fact that Talmadge was holding the hardcopy would have given him a reasonable basis to think it was still in effect. Talmadge's failure to check the expiration date must also be assessed in light of the circumstances at dispatch when Peczeniuk called:

> [TALMADGE:] During the course of [Peczeniuk's] traffic stop, another officer was attempting to arrest a subject on a warrant and he was being assaulted by this subject in the middle of the street in the other part of town. So part of my responsibilities were to send him immediate backup until we could secure the scene and at the same time, we started receiving several dozen 911 calls of people reporting the officer being assaulted in the street. . . .
> Q. What does that mean for Officer [Peczeniuk] as far as you know? He's already dealing with somebody.
> A. He's already on the stop and my attention is now focused on the other call.

(R. 17, PID 276–77.) Given that Talmadge was not specifically asked to check the expiration date, that he probably thought the PPO had not expired based on the LEIN or the existence of the hardcopy at dispatch, and that he was attempting to juggle validating the PPO with other pressing responsibilities, the Court finds that Talmadge's failure to relay or verify the PPO expiration date to have been a reasonable oversight. As such, he did not cause Scott to be "unreasonably" seized in violation of the Fourth Amendment. *See Heien*, 135 S. Ct. at 536.

**3.**

Scott asserts that Peczeniuk violated his Fourth Amendment right to be free from unreasonable seizures by arresting him without probable cause. (*See* Case No. 15-11773, R. 23, PID 540, 543.) Peczeniuk responds that there was probable cause for Scott's arrest, and, even if not, he is entitled to qualified immunity. (Case No. 15-11773, R. 16, PID 91.)

Before evaluating the parties' arguments, it is helpful to be explicit about what the summary-judgment record shows.

Scott believes that the record shows that after he and Coralee told Peczeniuk that the PPO was expired, Peczeniuk "failed to double check with dispatch on the status of the P.P.O." (Case

13

No. 15-11773, R. 23, PID 543.) There is testimony, even from Peczeniuk, to that effect. (R. 17, PID 129, 317.) But Peczeniuk had very limited recall of the day's events from several years earlier. (R. 17, PID 311.) More importantly, the police video unmistakably reflects that Peczeniuk returned to his patrol car and called dispatch after Scott and Coralee told him that the PPO expired. (Peczeniuk Video at 10:14.) Where a witness account is contrary to an unambiguous video recording of the events, the Court accepts what the video shows, even at summary judgment. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007); *Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014).

Scott also believes that the record shows that—at the time Peczeniuk first inquired about the PPO—Coralee told Peczeniuk that her nearby attorney had a copy of the order. (*See* Case No. 15-11773, R. 23, PID 534–35.) Certain testimony suggests that timing. (*See* R. 17, PID 128, 145.) But the video (and accompanying audio) unmistakably shows that when Peczeniuk first referenced the PPO to Scott and Coralee, Coralee did not tell Peczeniuk that her nearby attorney had a copy of the PPO. (Peczeniuk Video at 10:14.) Thus, the Court must conclude that Coralee referenced her attorney *after* Peczeniuk called dispatch. *See Scott*, 550 U.S. at 380–81; *Shreve*, 743 F.3d at 132.

With the facts clarified, the Court turns to the law.

"A police officer has probable cause if there is a 'fair probability' that the individual to be arrested has . . . committed . . . a crime." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002); *see also United States v. Dotson*, 49 F.3d 227, 230 (6th Cir. 1995). An officer's "initial probable cause determination must be founded on both the inculpatory and exculpatory evidence known to the arresting officer, and the officer cannot simply turn a blind eye toward potentially

exculpatory evidence." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (internal quotation marks and citations omitted).

The probable-cause standard is not the only law that governs Scott's claim against Peczeniuk. When, as here, an officer asserts that he is qualifiedly immune from a Fourth Amendment unlawful seizure claim, the officer will not be liable for an arrest lacking probable cause if he reasonably believed there was probable cause. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity."); *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.").[5]

---

[5] Some authority, including a case Scott cites, suggests that even when qualified immunity is asserted, the question is solely whether there was probable cause. *See e.g.*, *Evans v. City of Etowah, Tenn.*, 312 F. App'x 767, 771 (6th Cir. 2009); *Gardenhire v. Schubert*, 205 F.3d 303, 313 (6th Cir. 2000) ("There is no question that in 1996 the law was clearly established that, absent probable cause to believe that an offense had been committed, was being committed, or was about to be committed, officers may not arrest an individual. Thus, the only questions as to the Gardenhires' Fourth Amendment claim are those of fact: did Chief Schubert 'arrest' the Gardenhires on December 31, 1996? If so, did the arrest lack probable cause?" (internal quotation marks and citations omitted)).

This Court follows *Hunter* and *Anderson*. *See also Moses v. Mele*, 711 F.3d 213, 216 (1st Cir. 2013) ("[W]here, as here, a section 1983 action rests on a claim of false arrest, the qualified immunity standard is satisfied so long as the presence of probable cause is at least arguable."); *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (similar); *Crostley v. Lamar Cty., Texas*, 717 F.3d 410, 423 (5th Cir. 2013) (similar); *Thacker v. City of Columbus*, 328 F.3d 244, 260 (6th Cir. 2003) (similar); *Burritt v. Ditlefsen*, 807 F.3d 239, 250 (7th Cir. 2015) (similar); *Ehlers v. City of Rapid City*, — F.3d —, No. 16-1834, 2017 WL 359669, at *2 (8th Cir. Jan. 25, 2017) (similar); *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (similar); *Culver v. Armstrong*, 832 F.3d 1213, 1218 (10th Cir. 2016) (similar); *Fish v. Brown*, 838 F.3d 1153, 1167 (11th Cir. 2016) (similar); *Wesby v. D.C.*, 816 F.3d 96, 105–06 (D.C. Cir. 2016) (similar).

Arguably, if all that Peczeniuk had relied on was the LEIN, he could have reasonably believed that there was probable cause to arrest Scott. Peczeniuk had run Scott's license in the LEIN and it had returned a PPO protecting Coralee from Scott. Peczeniuk had confirmed that Scott's passenger was Coralee. In Peczeniuk's experience, the LEIN had never been incorrect in the County of St. Clair and had only been incorrect about certain impounded vehicles in Detroit. (R. 17, PID 343–44.) Although Scott and Coralee claimed that the LEIN was incorrect, Peczeniuk could have reasonably thought that Scott was making the claim to avoid arrest and that Coralee, the person protected by a restraining order, was making the claim under duress. Indeed, Peczeniuk testified, "In doing this job for approximately 10 years, I believe I've heard that many times people will say things are dropped, things are not valid. We rely on the information we have on file." (R. 17, PID 317.) A Michigan statute backs this testimony; in relevant part it says, "[A] personal protection order is immediately enforceable anywhere in this state by any law enforcement agency that . . . has verified its existence on the law enforcement information network[.]" Mich. Comp. Laws § 600.2950(21).

And case law indicates that an officer may arrest an individual based solely on information in the LEIN. In *Taggart v. Macomb County*, two state troopers "came upon plaintiff David Taggart whose automobile was stuck in the snow." 587 F. Supp. 1080, 1080 (E.D. Mich. 1982). While they waited for a tow truck, the troopers ran a check on Taggart in the LEIN. *Id.* The LEIN reflected an outstanding arrest warrant. *Id.* When the troopers went to arrest Taggart, he "'vociferously protested his arrest' and attempted to convince the officers that the aforementioned warrant had in fact been dismissed nearly two years previous." *Id.* Even so, the troopers proceeded with the arrest. *Id.* As it turned out, the warrant had been resolved but, "[d]ue to some apparent administrative oversight," it had not been removed from the LEIN. *Id.* at 1080–

16

81. Despite the erroneous arrest, the court held that the troopers were entitled to qualified immunity: "absent actual knowledge that an arrest warrant is no longer valid or in effect, it is reasonable for a law enforcement officer to make an arrest based upon information received through the LEIN system." *Id.* at 1082. The court further remarked, "It would unduly hamper law enforcement to require officers to go beyond, or attempt to independently verify, information received through the LEIN system." *Id.*; *see also Clark v. Oakland Cty.*, No. 08-14824, 2009 WL 5217682, at *4 (E.D. Mich. Dec. 29, 2009) (citing *Taggart* for the proposition that "law enforcement officers are entitled to qualified immunity where, absent actual knowledge that an arrest warrant was no longer valid or in effect, those officers rely upon LEIN in arresting a criminal defendant on an outstanding warrant").

Based on the above, the Court could conclude that the LEIN alone would lead a reasonable officer to believe that there was probable cause for Scott's arrest. But Peczeniuk had more than just the LEIN: when Scott and Coralee told Peczeniuk that the PPO had expired, Peczeniuk went back to his patrol car and radioed dispatch. And dispatch validated the PPO. With this extra information, the Court finds that a reasonable officer could have believed there was probable cause to arrest Scott.

It can be argued that, instead of simply asking Talmadge to generally verify or validate the PPO (which, as discussed, is the language he must have used), Peczeniuk could have specifically asked Talmadge to check the expiration date. But this Court must assess the existence of probable cause "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005). Taking that perspective, the Court does not believe that Peczeniuk's imprecise wording should strip him of qualified immunity.

17

In arguing that Peczeniuk is not entitled to qualified immunity, Scott relies heavily on *Azam v. Johnson*, No. C05-1858, 2007 WL 404814 (N.D. Cal. Feb. 2, 2007). There, Zameer Azam was driving with his girlfriend, Jennifer Bascom. 2007 WL 404814, at *1. Mark Johnson, a sheriff, pulled Azam over at a traffic stop. *Id.* While searching Azam's vehicle, Johnson learned from dispatch that Bascom had three restraining orders against Azam. *Id.* Johnson validated the orders in three ways: he checked the computer in his police car, he had dispatch call the county that issued the restraining orders (with dispatch reporting that the county had confirmed the orders), and he had an assisting officer call the county (with the assisting officer reporting that the county's records' employees had said the orders were valid and required Azam stay at least 100 yards from Bascom). Prior to or soon after being handcuffed, Azam told Johnson "that the restraining orders had been modified or were no longer valid." *Id.* at *2. Bascom said basically the same thing. *Id.* Most significantly, Azam also told Johnson that "he could prove his contention with the papers in his locked briefcase[, which was in the car,] if the officer would uncuff him and allow him to retrieve the documentation." *Id.* Johnson refused. *Id.* As it turned out, Azam was right: "the protective orders had been modified to eliminate the keep-away provisions." *Id.* at *3.

The *Azam* court found that Johnson lacked probable cause for the arrest, and, as relevant to this case, that Johnson was not entitled to qualified immunity. 2007 WL 404814, at *5–7. In so holding, the court relied heavily on the rule that an officer cannot "ignore readily available evidence in determining whether probable cause exists." *Id.* at *6. Johnson, in the court's opinion, had done just that: "The court cannot say that it was reasonable for officer Johnson to make his probable cause determination while ignoring Azam's offer to show him readily available documents that showed that the protective orders had been modified." *Id.* at *7.

18

2007 WL 404814, at *6.

*Azam* does not deprive Peczeniuk of qualified immunity. As an initial matter, under *Taggart*, Peczeniuk would not be liable for arresting Scott immediately after the LEIN check, and, at that point, Coralee had not yet mentioned her attorney. And Peczeniuk did not "ignore readily available evidence." Coralee's belief that she could go across the street and obtain a copy of the PPO from her lawyer is not the same as having a copy in the car. Nor has Scott even shown that the office was literally across the street, or that someone would have been immediately available to satisfy Coralee's request. Moreover, by the time Coralee said she would obtain a copy of the PPO from her attorney, Talmadge had already told Peczeniuk that he had the PPO in hand and it was valid. Peczeniuk thus could have reasonably thought that whatever Coralee's attorney would have produced (assuming he was even available) would not have trumped an actual copy of the PPO. Indeed, when Coralee stated, "My lawyer told us January. My lawyer is right here—," part of Peczeniuk's response was that "we have a hardcopy at our dispatch center." (Coleman Video at 10:24.)

In sum, perhaps Peczeniuk could have done more to verify that the PPO was still in effect. But, considering the totality of the circumstances, a reasonable officer would have believed that there was probable cause to arrest Scott. As such, qualified immunity shields Peczeniuk from Scott's Fourth Amendment claim. *See Hunter*, 502 U.S. at 227; *Anderson*, 483 U.S. at 641.

### 4.

Scott does not say much about how Conger contributed to his arrest. (*See* R. 1, ¶ 15; R. 17, PID 428.) And the record indicates that, other than being the director of the dispatch, and thus, Thompson and Talmadge's superior, Conger had no involvement. As such, Scott cannot

proceed under § 1983 against Conger. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). It follows that Scott's Fourth Amendment claim against Conger fails.

**5.**

Scott says that the City of Port Huron is liable under § 1983 because the City "does not provide constant, specific training in regards to P.P.O.'s to its police officers. Specifically, Defendant Peczeniuk testified he does not recall the last time he had training on P.P.O.s." (R. 23, PID 554.)

A city's failure to train its police officers only gives rise to liability under § 1983 "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 573 (6th Cir. 2016) (internal quotation marks omitted).

Scott cannot establish deliberate indifference in the usual way: evidence of "[a] pattern of similar constitutional violations by untrained employees." *Brown*, 844 F.3d at 573. Other than his own arrest, Scott has not identified any instances where a City of Port Huron police officer enforced an invalid PPO.

It is true that in "in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference." *Connick v. Thompson*, 563 U.S. 51, 63 (2011) (internal quotation marks omitted). In *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), "[t]he Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force." *Connick*, 563 U.S. at 63.

The City of Port Huron's conduct with respect to PPOs is nothing like the *Canton* hypothetical. Although Peczeniuk could not remember the last time he had training on the

enforcement of PPOs, he testified that he had training on a variety of topics four times a year and that, at some point, he had training specific to PPOs. (R. 17, PID 341–42.) Moreover, the City of Port Huron has a written policy for how PPOs should be enforced. (Case No. 15-11773, R. 16, PID 272.) And the policy reminds the City's officers that "[n]ot all incidents are clear cut on their face" and that if an officer cannot reach a decision of how to enforce the PPO, "a Supervisor should be contacted." (*Id.*) In light of Peczeniuk's testimony and the City's written policy, Scott has not created a triable issue on whether the City was deliberately indifferent to its citizens who are the subject of PPOs. *See Mayo v. Macomb Cty.*, 183 F.3d 554, 558 (6th Cir. 1999) ("The simple fact that Macomb County did have a written policy as to when an officer can arrest a person without a warrant pursuant to a PPO, which specifically refers to, and mirrors the relevant statute, M.C.L. 764.15b, seems to obviate the plaintiff's [failure-to-train] argument.").

**6.**

Scott also asserts that the County of St. Clair is liable under a failure-to-train theory; he says that the County "failed to train its employees as to the absolute importance of accuracy when inputting information into LEIN." (R. 20, PID 437.)

Not so. When asked about her training on "inputting PPO's into the LEIN," Thompson testified that when the County hires a dispatcher, "you get LEIN course through the Michigan State Police, you go through the LEIN class, that gets taught to you, and then a lot of it's on-the-job training. So you sit with a senior dispatcher or someone that has more experience than you and you learn." (R. 17, PID 167.) And Talmadge testified that "[a]t least once a year" the topic of verifying PPOs would be brought up in a staff meeting. (R. 17, PID 254.)

Moreover, what happened in this case appears to be extraordinarily rare. Consider the chain of events leading to Scott's arrest: Thompson had to enter the date incorrectly into the

21

LEIN, the second-party checker had to miss the error, those conducting the monthly validation had to miss the error, Peczeniuk had to not specifically mention the expiration date when he called Talmadge, and Talmadge had to overlook the expiration date when he responded to Peczeniuk. Indeed, Conger, the director of the County's dispatch, could recall only three other times where an error in the LEIN even got through the second-party check. (R. 17, PID 269–70.) And in two of those incidents, the error was caught during the monthly validation. (R. 17, PID 270.) Given that the type of mistake in this case almost never results in harm, Scott has not shown that the County's training was inadequate to the point of deliberate indifference.

Scott also claims that the County is liable on a failure-to-supervise theory. His argument is that the County did not adequately supervise its dispatchers because it never conducted performance reviews. (R. 20, PID 435–36.) The evidence supports Scott's assertion. (R. 17, PID 165, 212, 252.)

But the law does not support Scott's theory of liability. "While plaintiffs may successfully bring claims against municipalities for failure to supervise where they do not conduct reviews or monitor the performance of their employees, plaintiffs must also show that the municipality lacks such a process out of deliberate indifference for the constitutional violations that may occur as a result." *Amerson v. Waterford Twp.*, 562 F. App'x 484, 492 (6th Cir. 2014); *see also Scott v. Kent Cty.*, No. 16-1587, 2017 WL 655773, at *5 (6th Cir. Feb. 17, 2017) ("To support his failure to supervise claim, Scott only offers evidence that Kent County does not conduct yearly performance evaluations on its corrections officers. This is not sufficient to prevail under a failure to supervise theory."). Given that the mistake in this case had almost never occurred, the County's failure to formally review its dispatcher's performance does not

suggest that it was deliberately indifferent to how its dispatchers were handling PPOs. Scott's failure-to-supervise claim therefore fails.

**B.**

In addition to claiming that Defendants violated the Fourth Amendment, Scott also says that Defendants violated Michigan law. For one, Scott claims that Thompson, Talmadge, Conger, and Peczeniuk are liable for false arrest and false imprisonment.

Thompson is not liable for these two state-law torts because they are of the intentional variety, *see Burland v. French*, No. 305652, 2012 WL 2362442, at *5 (Mich. Ct. App. June 21, 2012); *Simmons v. Greektown Casino LLC*, No. 286845, 2009 WL 3051471, at *2 (Mich. Ct. App. Sept. 24, 2009), and, as detailed above, no reasonable jury could think that Thompson intended to enter the incorrect date in the LEIN or that she intended for Scott to be arrested or imprisoned.

Conger is not liable for false arrest or false imprisonment for the same reason. Indeed, he did not even learn about the events giving rise to this case until after he was sued.

As for Talmadge and Peczeniuk, their assertion of immunity is well taken. (*See* R. 17, PID 103; Case No. 15-11773, R. 16, PID 98–99.) Under Michigan law, an officer is immune from an intentional-tort claim where his acts giving rise to the claim were taken while the officer was performing his job, his acts were (or he believed them to be) in the scope of his authority, his acts were discretionary and not ministerial, and, as most important here, his acts were taken in good faith and not with malice. *Odom v. Wayne Cty.*, 760 N.W.2d 217, 228 (Mich. 2008). Peczeniuk was indisputably acting within the scope of his authority and exercised discretion in arresting Scott. *See id.* at 226 ("An officer must use his judgment to determine whether there is . . . probable cause to arrest[.]"). Further, as detailed above, even taking the evidence in the

light most favorable to Scott, Peczeniuk acted in good faith in arresting Scott. *See Odom*, 760 N.W.2d at 225 ("This Court has described a lack of good faith as 'malicious intent, capricious action or corrupt conduct' or 'willful and corrupt misconduct.'"); *Simmons*, 2009 WL 3051471, at *2 ("A police officer is entitled to immunity [under Michigan law] if he or she acted in good faith and honestly believed that there was probable cause to arrest, even if he or she actually lacked probable cause."). Peczeniuk is thus entitled to immunity.

The application of the immunity elements is almost as straightforward as to Talmadge: he was performing within the scope of his authority and acted in good faith in validating the PPO. The only potential point of dispute ("potential" because Scott does not even make the argument) is whether his validation of the PPO was ministerial. "Ministerial acts constitute merely an obedience to orders or the performance of a duty in which the individual has little or no choice. Discretionary acts require personal deliberation, decision and judgment." *Odom*, 760 N.W.2d at 226. Although Talmadge did not engage in much deliberation or exercise a lot of judgment, he did exercise discretion in responding to Peczeniuk's call. In particular, Talmadge had to decide which parts of the LEIN readout and the PPO should be examined and what information should be conveyed to Peczeniuk. Because there is no evidence that dispatchers validating PPOs are instructed to mechanistically check the same items and convey the same information (*cf.* R. 17, PID 280), Talmadge did not merely make the "trivial decision[s]" of a ministerial actor, *see Odom*, 760 N.W.2d at 226. As such, Talmadge is also entitled to immunity.

In sum, Scott has not produced evidence permitting a reasonable jury to find that Thompson or Conger acted with the intent required to be liable for false arrest or false imprisonment. And the Court finds that Talmadge and Peczeniuk have carried their burden of proving immunity from those intentional torts.

**C.**

Scott further claims that Thompson, Talmadge, Conger, and Peczeniuk are liable under Michigan law for committing gross negligence.

Defendants (or at least Peczeniuk) argue that Scott's gross-negligence claim is merely a false-arrest or false-imprisonment claim in disguise. (*See* Case No. 15-11773, R. 16, PID 99.) For this reason, they say, the Court need not address gross negligence. (*See id.*)

Perhaps Defendants are correct. But Defendants also say they are immune from any gross-negligence claim. (Case No. 15-11773, R. 16, PID 99–100; R. 17, PID 104.) And the Court agrees with Defendants on this point.

Under Michigan law, an employee of a governmental agency is immune from a tort sounding in negligence if the agency was discharging a governmental function, the employee was acting on behalf of the agency, the employee was acting (or believed he was acting) in the scope of his authority, and the employee's "conduct does not amount to gross negligence that is the proximate cause of the injury or damage." Mich. Comp. Laws § 691.1407(2); *see also Odom*, 760 N.W.2d at 228.

Here, the parties only genuinely dispute whether Thompson, Talmadge, Conger, and Peczeniuk were grossly negligent. Even taking the facts in the light most favorable to Scott, they were not. Michigan's governmental-immunity statute defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(8). For reasons the Court provided in analyzing Scott's Fourth Amendment claim, the record does not suggest that Thompson, Talmadge, Conger, and Peczeniuk had a "substantial lack of concern" that Scott would be falsely arrested. They are thus immune from a claim of gross negligence. *See Maiden v. Rozwood*, 597 N.W.2d 817, 824 (Mich.

25

1999) ("The plain language of the governmental immunity statute indicates that the Legislature limited employee liability to situations where the contested conduct was substantially more than negligent.").

## IV.

Scott's arrest and time in jail were surely unfortunate. But, with respect to Scott's Fourth Amendment claim, Thompson, Talmadge, Conger, and Peczeniuk are not liable because they acted reasonably in carrying out their official duties. And the City of Port Huron and the County of St. Clair have not been shown to have inadequately trained or supervised Thompson, Talmadge, Conger, and Peczeniuk. As for Scott's two state-law claims, Thompson, Talmadge, Conger, and Peczeniuk are immune from those because they acted in good faith and were not grossly negligent when they engaged in the conduct that led to Scott's arrest. It follows that Defendants Thompson, Talmadge, Conger, and the County of St. Clair's motion for summary judgment (Case No. 16-11874, R. 17) is GRANTED, and that Defendants Peczeniuk and the City of Port Huron's motion for summary judgment (Case No. 15-11773, R. 16) is GRANTED.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
Dated: March 6, 2017                    U.S. DISTRICT JUDGE

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 6, 2017.

s/Keisha Jackson
Case Manager